## FEDERAL ELECTION COMMISSION *v.* NATIONAL CONSERVATIVE POLITICAL ACTION COMMITTEE ET AL.

No. 83–1032.   Argued November 28, 1984—Decided March 18, 1985*

*Together with No. 83–1122, *Democratic Party of the United States et al.* v. *National Conservative Political Action Committee et al.*, also on appeal from the same court.

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and O'CONNOR, JJ., joined, and in Part II of which BRENNAN and STEVENS, JJ., joined. STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 501. WHITE, J., filed a dissenting opinion, in Part I of which BRENNAN and MARSHALL, JJ., joined, *post*, p. 502. MARSHALL, J., filed a dissenting opinion, *post*, p. 518.

*Charles N. Steele* argued the cause for appellant in No. 83–1032. With him on the briefs were *Richard B. Bader, Miriam Aguiar,* and *Jonathan A. Bernstein. Steven B. Feirson* argued the cause for appellants in No. 83–1122. With him on the briefs were *John M. Coleman* and *Anthony S. Harrington.*

*Robert R. Sparks, Jr.,* argued the cause for appellees in both cases. With him on the brief was *J. Curtis Herge.*†

JUSTICE REHNQUIST delivered the opinion of the Court.‡

The Presidential Election Campaign Fund Act (Fund Act), 26 U. S. C. § 9001 *et seq.*, offers the Presidential candidates of major political parties the option of receiving public financing for their general election campaigns. If a Presidential candidate elects public financing, § 9012(f) makes it a criminal offense for independent "political committees," such as appellees National Conservative Political Action Committee (NCPAC) and Fund For A Conservative Majority (FCM), to expend more than $1,000 to further that candidate's election. A three-judge District Court for the Eastern District of Pennsylvania, in companion lawsuits brought respectively by the Federal Election Commission (FEC) and by the Democratic Party of the United States and the Democratic Na-

---

†Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union by *Philip A. Lacovara, Ronald A. Stern, Charles S. Sims,* and *Arthur B. Spitzer;* for the Gulf & Great Plains Legal Foundation et al. by *Wilkes C. Robinson;* and for the National Congressional Club by *Brice M. Clagett* and *John R. Bolton.*

*Roger M. Witten, William T. Lake,* and *Archibald Cox* filed a brief for Common Cause as *amicus curiae.*

‡JUSTICE BRENNAN joins only Part II of this opinion.

tional Committee (DNC), held § 9012(f) unconstitutional on its face because it violated the First Amendment to the United States Constitution. These plaintiffs challenge that determination on this appeal, and the FEC also appeals from that part of the judgment holding that the Democratic Party and the DNC have standing under 26 U. S. C. § 9011(b)(1) to seek a declaratory judgment against appellees upholding the constitutionality of § 9012(f). We noted probable jurisdiction pursuant to the statutory appeal provision of § 9011(b)(2), which provides for a direct appeal to this Court from three-judge district courts convened in proceedings under § 9011(b)(1). 466 U. S. 935 (1984). We reverse the judgment of the District Court on the issue of the standing of the Democratic Party and the DNC, but affirm its judgment as to the constitutional validity of § 9012(f).

The present litigation began in May 1983 when the Democratic Party, the DNC, and Edward Mezvinsky, Chairman of the Pennsylvania Democratic State Committee, in his individual capacity as a citizen eligible to vote for President of the United States[1] (collectively, the Democrats), filed suit against NCPAC and FCM (the PACs), who had announced their intention to spend large sums of money to help bring about the reelection of President Ronald Reagan in 1984. Their amended complaint sought a declaration that § 9012(f), which they believed would prohibit the PACs' intended expenditures, was constitutional. The FEC intervened for the sole purpose of moving, along with the PACs, to dismiss the complaint for lack of standing.

In June 1983, the FEC brought a separate action against the same defendants seeking identical declaratory relief. It was referred to the same three-judge District Court, which consolidated the two cases for all purposes. The parties submitted 201 stipulations and three books of exhibits as

---

[1] Mezvinsky did not pursue an appeal in this Court, though his name was inadvertently included in the notice of appeal filed by the Democratic Party and the DNC.

the factual record. After extensive briefing and oral argument, the court issued a comprehensive opinion, holding that the Democrats had standing under § 9011(b)(1) and Art. III of the Constitution to seek the requested declaratory relief, but that the Democrats and the FEC were not entitled to a declaration that § 9012(f) is constitutional. 578 F. Supp. 797 (1983). The court held that § 9012(f) abridges First Amendment freedoms of speech and association, that it is substantially overbroad, and that it cannot permissibly be given a narrowing construction to cure the overbreadth. The court did not, however, declare § 9012(f) unconstitutional because the PACs had not filed a counterclaim requesting such a declaration.

I

In their respective suits, the Democrats and the FEC relied upon 26 U. S. C. § 9011(b) to confer standing on them and subject-matter jurisdiction on the three-judge District Court. Section 9011(b)(1) provides:

> "The [FEC], the national committee of any political party, and individuals eligible to vote for President are authorized to institute such actions, including actions for declaratory judgment or injunctive relief, as may be appropriate to implement or con[s]true any provisions of [the Fund Act]."

Section 9011(b)(2) confers subject-matter jurisdiction on the district courts of the United States, sitting in panels of three judges in accordance with 28 U. S. C. § 2284, to hear proceedings instituted under § 9011(b)(1).

We do not doubt, nor do any of the parties in these cases challenge, the standing of the FEC, which is specifically identified in § 9011(b)(1), to bring a declaratory action to test the constitutionality of a provision of the Fund Act. We think such an action is "appropriate" within the meaning of that section because a favorable declaration would materially advance the FEC's ability to expedite its enforcement of the

Fund Act against political committees such as NCPAC and FCM. This is especially important because the relatively short duration of the then upcoming general election campaigns for President allowed little time in which to prosecute an enforcement action before it would become moot in whole or in part. We are fortified in our conclusion by § 306(b)(1) of the Federal Election Campaign Act of 1971 (FECA), as added, 88 Stat. 1281, and amended, 2 U. S. C. § 437c(b)(1), which provides that the FEC "shall have exclusive jurisdiction with respect to the civil enforcement" of the Fund Act. Article III standing exists by virtue of the facts that the FEC and the PACs have adverse interests, the PACs threatened, and now have made, substantial expenditures in apparent contravention of 26 U. S. C. § 9012(f), and the declaratory relief the FEC requests would aid its enforcement efforts against the PACs and others similarly situated.

Despite the identity of the relief requested by the FEC and the Democrats, the FEC asks this Court to reverse the District Court's holding that the Democrats also have standing under § 9011(b)(1). The Democrats maintain that there is no need to resolve this question because there is no doubt about the standing of the FEC and the legal issues and relief requested are the same in the two cases. See *McCulloch* v. *Sociedad Nacional de Marineros de Honduras*, 372 U. S. 10, 16 (1963). The PACs have declined to renew or brief their jurisdictional challenge in this Court because in the present procedural posture they see the standing question as a "turf fight" in which they do not wish to participate.

Though *McCulloch, supra,* is authority on its somewhat different facts for finessing a decision as to questions of "jurisdiction" in one of two companion cases raising the same substantive issues, we decline to follow that course here. The statutory standing issue is squarely presented by the Democrats' appeal, and if the FEC is correct in its assertion as to lack of standing, the decision of the District Court could seriously interfere with the agency's exclusive jurisdiction to

determine how and when to enforce the Act. In the present cases, for example, there is no indication that the FEC would have filed a complaint against the PACs for a declaratory judgment if the Democrats had not done so first. The FEC might have chosen to focus its resources elsewhere or to pursue an enforcement action at a later date. The Democrats forced its hand; the subject of the litigation was so central to the FEC's function that it had no choice but to intervene once the action had been commenced.

The plain language of the Fund Act and the FECA suggests quite emphatically that the Democrats do not have standing to bring a private action against another private party. In addition to the FEC, § 9011(b)(1) applies only to "the national committee of any political party" and to "individuals eligible to vote for President." Clearly the Democratic Party is not included; hence the District Court erred in permitting it to remain in the proceedings. The DNC is a national committee of a political party, and Edward Mezvinsky is an individual eligible to vote for President; therefore, they are authorized to bring actions under § 9011(b)(1). But such actions must be "appropriate to implement or construe" the provision of the Fund Act at issue. The District Court's conclusion that the language of the statute "plainly" authorizes a private suit to seek construction of § 9012(f) seems to us to ignore the word "appropriate." That word would be superfluous unless it restricts standing to suits which are "appropriate" in light of the statutory scheme for interpreting and enforcing the Act.

This scheme seems simple enough. Title 2 U. S. C. § 437c(b)(1) provides that the FEC "shall administer, seek to obtain compliance with, and formulate policy with respect to" the Fund Act and confers on the FEC "exclusive jurisdiction with respect to the civil enforcement of" the Act. Title 26 U. S. C. § 9010(a) authorizes the FEC "to appear in and defend against any action filed under section 9011." Reading these two provisions together with § 9011, "appropriate" ac-

tions by private parties are actions that do not interfere with the FEC's responsibilities for administering and enforcing the Act. Common sense indicates that only one body can intelligently formulate the policy necessary to administer an Act of this kind. The decision to sue third parties to construe or enforce the Act falls within these functions. Accordingly, private suits of this kind are inappropriate interference with the FEC's responsibilities.

Consistent with this statutory scheme an "appropriate" role for private parties under § 9011(b)(1) would be to bring suits against the FEC to challenge its interpretations of various provisions of the Act. For example, the defendant PACs might have instituted an action challenging the FEC's interpretation of § 9012(f) to cover the type of independent expenditures they planned to make. The specific authorization in the adjacent § 9010(a) for the FEC to appear in and defend actions under § 9011 implies that Congress contemplated that private suits pursuant to the latter section would be directed at the FEC. Lest one ask why the FEC is also given standing under § 9011(b)(1), the obvious answer would be to give it the benefit of a three-judge district court and direct appeal to this Court under § 9011(b)(2), which procedures are not available in ordinary § 437c(b)(1) enforcement actions. See 2 U. S. C. §§ 437g(a)(6), (10).

This interpretation makes a good deal of sense. Suits to construe the Fund Act and to bring about implementation of the Act—presumably implementation by the FEC, which has exclusive authority to administer and enforce the Act—raise issues that are likely to be of great importance and in Congress' judgment justify a three-judge court, expedited review, and direct appeal to this Court. Ordinary enforcement actions to obtain compliance with the terms of the Act after they have been construed and implemented would not justify such extraordinary procedures. Moreover, it seems highly dubious that Congress intended every one of the millions of eligible voters in this country to have the power to

invoke expedited review by a three-judge district court with direct appeal to this Court in actions brought by them against other private parties. The DNC is obviously not just another private litigant, and it would undoubtedly be a worthy representative of collective interests which would justify expedited review had Congress so provided; but Congress simply did not draft the statute in a way that distinguishes the DNC from any individual voter.

Consistent with FEC's supervisory role, Congress provided an administrative complaint procedure in 2 U. S. C. § 437g, through which the Democrats could have pursued their dispute with the PACs. The Democrats could have filed a complaint expressing their belief that "a violation [of the Fund Act] ha[d] occurred" based on the PACs' independent expenditures in the 1980 Presidential election. § 437g(a)(1). If the FEC, "upon receiving a complaint . . . or on the basis of information ascertained in the normal course of carrying out its supervisory responsibilities, determines . . . that it has reason to believe that a person has committed, or is about to commit, a violation [of the Fund Act]," § 437g(a)(2), it is obligated to investigate and, if it finds "probable cause to believe that any person has committed, or is about to commit, a violation," to pursue various corrective and enforcement steps, which can ultimately involve civil and criminal proceedings in district court.

If the FEC dismissed the complaint or failed to act on it in 120 days, the Democrats could petition the District Court for the District of Columbia under § 437g(a)(8) for a declaration that the FEC had acted contrary to law and for an order directing the FEC to pursue the complaint. If, and only if, the FEC failed to obey such an order, could the Democrats bring a civil action directly against the PACs to remedy the violation charged in their complaint.

Alternatively, the DNC or an individual voter could sue the FEC under 26 U. S. C. § 9011(b) to implement or construe the Act. This avenue, of course, is available to the

Democrats without first pursuing or exhausting the § 437g administrative complaint procedure, see § 9011(b)(2), but it would be worth pursuing only if the disagreement between the litigant and the FEC were over a matter of implementation or construction, and not routine enforcement. However, that is a judgment Congress made in establishing the statutory scheme.

We do not necessarily reject the District Court's conclusion that the legislative history of the successive amendments to § 437c(b)(1) indicates an intention by the word "exclusive" to centralize in one agency the civil enforcement responsibilities previously fragmented among various governmental agencies. But nowhere is there any indication that Congress previously expressed any intention that anyone other than Government agencies have enforcement responsibilities. Section 9011(b) certainly is not a source of general private "enforcement" authority, as that word is conspicuously absent from § 9011(b), which speaks only of suits to "implement or construe."[2] We also do not believe that an intention to create a so-called "maximum enforcement regime," calling for both Government and private enforcement, can be inferred from the fact that other congressional Acts, such as the Surface Mining Control and Reclamation Act of 1977, 30 U. S. C. § 1270, the Energy Policy and Conservation Act, 42 U. S. C. § 6305, and the Clean Air Act, 42 U. S. C. § 7604, expressly adopt such an enforcement scheme. Nor may it be inferred from the fact that the related FECA has a different enforcement scheme than the Fund Act. Compare 2 U. S. C. § 437d(e) and 26 U. S. C. § 9011(b). Such speculative inferences do not carry the day in the face of the contrary language of the Fund Act.

In view of our conclusion that the Democrats lack standing under the statute, there is no need to reach the Art. III issue

---

[2] The Democrats implicitly conceded as much by amending their complaint to delete their initial request for injunctive relief.

decided by the District Court. Therefore, we turn to the merits of the FEC's appeal of its unsuccessful declaratory judgment action against the PACs.

## II

NCPAC is a nonprofit, nonmembership corporation formed under the District of Columbia Nonprofit Corporation Act in August 1975 and registered with the FEC as a political committee. Its primary purpose is to attempt to influence directly or indirectly the election or defeat of candidates for federal, state, and local offices by making contributions and by making its own expenditures. It is governed by a three-member board of directors which is elected annually by the existing board. The board's chairman and the other two members make all decisions concerning which candidates to support or oppose, the strategy and methods to employ, and the amounts of money to spend. Its contributors have no role in these decisions. It raises money by general and specific direct mail solicitations. It does not maintain separate accounts for the receipts from its general and specific solicitations, nor is it required by law to do so.

FCM is incorporated under the laws of Virginia and is registered with the FEC as a multicandidate political committee. In all material respects it is identical to NCPAC.

Both NCPAC and FCM are self-described ideological organizations with a conservative political philosophy. They solicited funds in support of President Reagan's 1980 campaign, and they spent money on such means as radio and television advertisements to encourage voters to elect him President. On the record before us, these expenditures were "independent" in that they were not made at the request of or in coordination with the official Reagan election campaign committee or any of its agents. Indeed, there are indications that the efforts of these organizations were at times viewed with disfavor by the official campaign as counterproductive to its chosen strategy. NCPAC and FCM expressed their intention to conduct similar activities in support of President

Reagan's reelection in 1984, and we may assume that they did so.

As noted above, both the Fund Act and FECA play a part in regulating Presidential campaigns. The Fund Act comes into play only if a candidate chooses to accept public funding of his general election campaign, and it covers only the period between the nominating convention and 30 days after the general election. In contrast, FECA applies to all Presidential campaigns, as well as other federal elections, regardless of whether publicly or privately funded. Important provisions of these Acts have already been reviewed by this Court in *Buckley* v. *Valeo*, 424 U. S. 1 (1976). Generally, in that case we upheld as constitutional the limitations on *contributions to candidates* and struck down as unconstitutional *limitations on independent expenditures.*[3]

In these cases we consider provisions of the Fund Act that make it a criminal offense for political committees such as NCPAC and FCM to make independent expenditures in support of a candidate who has elected to accept public financing. Specifically, § 9012(f) provides:

"(1) . . . it shall be unlawful for any political committee which is not an authorized committee with respect to the eligible candidates of a political party for President and Vice President in a presidential election knowingly and willfully to incur expenditures to further the election of such candidates, which would constitute qualified campaign expenses if incurred by an authorized committee of such candidates, in an aggregate amount exceeding $1,000."

The term "political committee" is defined to mean "any committee, association, or organization (whether or not incorporated) which accepts contributions or makes expenditures for

---

[3] In *Buckley*, THE CHIEF JUSTICE and JUSTICE BLACKMUN would have struck down the limitations on contributions along with the limitations on independent expenditures. JUSTICE WHITE would have upheld both limitations.

the purpose of influencing, or attempting to influence, the nomination or election of one or more individuals to Federal, State, or local elective public office." 26 U. S. C. § 9002(9). The term "qualified campaign expense" simply means an otherwise lawful expense by a candidate or his authorized committee "to further his election" incurred during the period between the candidate's nomination and 30 days after election day. §§ 9002(11), 9002(12). The term "eligible candidates" means those Presidential and Vice Presidential candidates who are qualified under the Act to receive public funding and have chosen to do so. §§ 9002(4), 9003. Two of the more important qualifications are that a candidate and his authorized committees not incur campaign expenses in excess of his public funding and not accept contributions to defray campaign expenses. §§ 9003(b), 9012(b).

There is no question that NCPAC and FCM are political committees and that President Reagan was a qualified candidate, and it seems plain enough that the PACs' expenditures fall within the term "qualified campaign expense." The PACs have argued in this Court, though apparently not below, that § 9012(f) was not intended to cover truly independent expenditures such as theirs, but only coordinated expenditures. But "expenditures in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents," are considered "contributions" under the FECA, 2 U. S. C. § 441a(a)(7)(B)(i), and as such are already subject to FECA's $1,000 and $5,000 limitations in §§ 441a(a)(1), (2). Also, as noted above, one of the requirements for public funding is the candidate's agreement not to accept such contributions. Under the PACs' construction, § 9012(f) would be wholly superfluous, and we find no support for that construction in the legislative history. We conclude that the PACs' independent expenditures at issue in this case are squarely prohibited by § 9012(f), and we proceed to consider whether that prohibition violates the First Amendment.

There can be no doubt that the expenditures at issue in this case produce speech at the core of the First Amendment. We said in *Buckley* v. *Valeo, supra,* at 14:

"The Act's contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' *Roth* v. *United States,* 354 U. S. 476, 484 (1957). . . . This no more than reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open,' *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 270 (1964)."

The PACs in this case, of course, are not lone pamphleteers or street corner orators in the Tom Paine mold; they spend substantial amounts of money in order to communicate their political ideas through sophisticated media advertisements. And of course the criminal sanction in question is applied to the expenditure of money to propagate political views, rather than to the propagation of those views unaccompanied by the expenditure of money. But for purposes of presenting political views in connection with a nationwide Presidential election, allowing the presentation of views while forbidding the expenditure of more than $1,000 to present them is much like allowing a speaker in a public hall to express his views while denying him the use of an amplifying system. The Court said in *Buckley* v. *Valeo, supra:*

"A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expres-

sion by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event. The electorate's increasing dependence on television, radio, and other mass media for news and information has made these expensive modes of communication indispensable instruments of effective political speech." 424 U. S., at 19.

We also reject the notion that the PACs' form of organization or method of solicitation diminishes their entitlement to First Amendment protection. The First Amendment freedom of association is squarely implicated in these cases. NCPAC and FCM are mechanisms by which large numbers of individuals of modest means can join together in organizations which serve to "amplif[y] the voice of their adherents." *Buckley* v. *Valeo*, 424 U. S., at 22; *NAACP* v. *Alabama*, 357 U. S. 449, 460 (1958); *Citizens Against Rent Control* v. *Berkeley*, 454 U. S. 290, 295–296 (1981). It is significant that in 1979–1980 approximately 101,000 people contributed an average of $75 each to NCPAC and in 1980 approximately 100,000 people contributed an average of $25 each to FCM.

The FEC urges that these contributions do not constitute individual speech, but merely "speech by proxy," see *California Medical Assn.* v. *FEC*, 453 U. S. 182, 196 (1981) (MARSHALL, J.) (plurality opinion), because the contributors do not control or decide upon the use of the funds by the PACs or the specific content of the PACs' advertisements and other speech. The plurality emphasized in that case, however, that nothing in the statutory provision in question "limits the amount [an unincorporated association] or any of its members may independently expend in order to advocate political views," but only the amount it may contribute to

a multicandidate political committee. *Id.*, at 195. Unlike *California Medical Assn.*, the present cases involve limitations on expenditures by PACs, not on the contributions they receive; and in any event these contributions are predominantly small and thus do not raise the same concerns as the sizable contributions involved in *California Medical Assn.*

Another reason the "proxy speech" approach is not useful in this case is that the contributors obviously like the message they are hearing from these organizations and want to add their voices to that message; otherwise they would not part with their money. To say that their collective action in pooling their resources to amplify their voices is not entitled to full First Amendment protection would subordinate the voices of those of modest means as opposed to those sufficiently wealthy to be able to buy expensive media ads with their own resources.

Our decision in *FEC* v. *National Right to Work Committee*, 459 U. S. 197 (1982) *(NRWC)*, is not to the contrary. That case turned on the special treatment historically accorded corporations. In return for the special advantages that the State confers on the corporate form, individuals acting jointly through corporations forgo some of the rights they have as individuals. *Id.*, at 209–210. We held in *NRWC* that a rather intricate provision of the FECA dealing with the prohibition of corporate campaign contributions to political candidates did not violate the First Amendment. The prohibition excepted corporate solicitation of contributions to a segregated fund established for the purpose of contributing to candidates, but in turn limited such solicitations to stockholders or members of a corporation without capital stock. We upheld this limitation on solicitation of contributions as applied to the National Right to Work Committee, a corporation without capital stock, in view of the well-established constitutional validity of legislative regulation of corporate contributions to candidates for public office. *NRWC* is consistent with this Court's earlier holding that a corporation's

expenditures to propagate its views on issues of general public interest are of a different constitutional stature than corporate contributions to candidates. *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 789–790 (1978). In *Bellotti*, of course, we did not reach, nor do we need to reach in these cases, the question whether a corporation can constitutionally be restricted in making independent expenditures to influence elections for public office. *Id.*, at 788, n. 26.

Like the National Right to Work Committee, NCPAC and FCM are also formally incorporated; however, these are not "corporations" cases because § 9012(f) applies not just to corporations but to any "committee, association, or organization (whether or not incorporated)" that accepts contributions or makes expenditures in connection with electoral campaigns. The terms of § 9012(f)'s prohibition apply equally to an informal neighborhood group that solicits contributions and spends money on a Presidential election as to the wealthy and professionally managed PACs involved in these cases. See *Citizens Against Rent Control* v. *Berkeley, supra,* at 300 (REHNQUIST, J., concurring).

Having concluded that the PACs' expenditures are entitled to full First Amendment protection, we now look to see if there is a sufficiently strong governmental interest served by § 9012(f)'s restriction on them and whether the section is narrowly tailored to the evil that may legitimately be regulated. The restriction involved here is not merely an effort by the Government to regulate the use of its own property, such as was involved in *United States Postal Service* v. *Greenburgh Civic Assns.*, 453 U. S. 114 (1981), or the dismissal of a speaker from Government employment, such as was involved in *Connick* v. *Myers*, 461 U. S. 138 (1983). It is a flat, across-the-board criminal sanction applicable to any "committee, association, or organization" which spends more than $1,000 on this particular type of political speech.

We held in *Buckley* and reaffirmed in *Citizens Against Rent Control* that preventing corruption or the appearance of corruption are the only legitimate and compelling govern-

ment interests thus far identified for restricting campaign finances. In *Buckley* we struck down the FECA's limitation on individuals' independent expenditures because we found no tendency in such expenditures, uncoordinated with the candidate or his campaign, to corrupt or to give the appearance of corruption. For similar reasons, we also find § 9012(f)'s limitation on independent expenditures by political committees to be constitutionally infirm.

Corruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns. The hallmark of corruption is the financial *quid pro quo:* dollars for political favors. But here the conduct proscribed is not contributions to the candidate, but independent expenditures in support of the candidate. The amounts given to the PACs are overwhelmingly small contributions, well under the $1,000 limit on contributions upheld in *Buckley;* and the contributions are by definition not coordinated with the campaign of the candidate. The Court concluded in *Buckley* that there was a fundamental constitutional difference between money spent to advertise one's views independently of the candidate's campaign and money contributed to the candidate to be spent on his campaign. We said there:

> "Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." 424 U. S., at 47.

We think the same conclusion must follow here. It is contended that, because the PACs may by the breadth of their organizations spend larger amounts than the individuals in

*Buckley*, the potential for corruption is greater. But precisely what the "corruption" may consist of we are never told with assurance. The fact that candidates and elected officials may alter or reaffirm their own positions on issues in response to political messages paid for by the PACs can hardly be called corruption, for one of the essential features of democracy is the presentation to the electorate of varying points of view. It is of course hypothetically possible here, as in the case of the independent expenditures forbidden in *Buckley*, that candidates may take notice of and reward those responsible for PAC expenditures by giving official favors to the latter in exchange for the supporting messages. But here, as in *Buckley*, the absence of prearrangement and coordination undermines the value of the expenditure to the candidate, and thereby alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate. On this record, such an exchange of political favors for uncoordinated expenditures remains a hypothetical possibility and nothing more.

Even were we to determine that the large pooling of financial resources by NCPAC and FCM did pose a potential for corruption or the appearance of corruption, § 9012(f) is a fatally overbroad response to that evil. It is not limited to multimillion dollar war chests; its terms apply equally to informal discussion groups that solicit neighborhood contributions to publicize their views about a particular Presidential candidate.

Several reasons suggest that we are not free to adopt a limiting construction that might isolate wealthy PACs, even if such a construction might save the statute. First, Congress plainly intended to prohibit just what § 9012(f) prohibits—independent expenditures over $1,000 by all political committees, large and small. Even if it did not intend to cover small neighborhood groups, there is also no evidence in the statute or the legislative history that it would have looked

favorably upon a construction of the statute limiting § 9012(f) only to very successful PACs. Secondly, we cannot distinguish in principle between a PAC that has solicited 1,000 $25 contributions and one that has solicited 100,000 $25 contributions. Finally, it has been suggested that § 9012(f) could be narrowed by limiting its prohibition to political committees in which the contributors have no voice in the use to which the contributions are put. Again, there is no indication in the statute or the legislative history that Congress would be content with such a construction. More importantly, as observed by the District Court, such a construction is intolerably vague. At what point, for example, does a neighborhood group that solicits some outside contributions fall within § 9012(f)? How active do the group members have to be in setting policy to satisfy the control test? Moreover, it is doubtful that the members of a large association in which each have a vote on policy have substantially more control in practice than the contributors to NCPAC and FCM: the latter will surely cease contributing when the message those organizations deliver ceases to please them.

In the District Court, the FEC attempted to show actual corruption or the appearance of corruption by offering evidence of high-level appointments in the Reagan administration of persons connected with the PACs and newspaper articles and polls purportedly showing a public perception of corruption. The District Court excluded most of the proffered evidence as irrelevant to the critical elements to be proved: corruption of candidates or public perception of corruption of candidates. A tendency to demonstrate distrust of PACs is not sufficient. We think the District Court's finding that "the evidence supporting an adjudicative finding of corruption or its appearance is evanescent," 587 F. Supp., at 830, was clearly within its discretion, and we will not disturb it here. If the matter offered by the FEC in the District Court be treated as addressed to what the District Court

referred to as "legislative facts," we nonetheless agree with the District Court that the evidence falls far short of being adequate for this purpose.

Finally, the FEC urges us to uphold § 9012(f) as a prophylactic measure deemed necessary by Congress, which has far more expertise than the Judiciary in campaign finance and corrupting influences. In *NRWC*, 459 U. S., at 210, we stated:

"While [2 U. S. C.] § 441b restricts the solicitation of corporations and labor unions without great financial resources, as well as those more fortunately situated, we accept Congress' judgment that it is the potential for such influence that demands regulation. Nor will we second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared."

Here, however, the groups and associations in question, designed expressly to participate in political debate, are quite different from the traditional corporations organized for economic gain. In *NRWC* we rightly concluded that Congress might include, along with labor unions and corporations traditionally prohibited from making contributions to political candidates, membership corporations, though contributions by the latter might not exhibit all of the evil that contributions by traditional economically organized corporations exhibit. But this proper deference to a congressional determination of the need for a prophylactic rule where the evil of potential corruption had long been recognized does not suffice to establish the validity of § 9012(f), which indiscriminately lumps with corporations any "committee, association or organization." Indeed, the FEC in its briefs to this Court does not even make an effort to defend the statute under a construction limited in reach to corporations.

While in *NRWC* we held that the compelling governmental interest in preventing corruption supported the restriction

of the influence of political war chests funneled through the corporate form, in the present cases we do not believe that a similar finding is supportable: when the First Amendment is involved, our standard of review is "rigorous," *Buckley* v. *Valeo*, 424 U. S., at 29, and the effort to link either corruption or the appearance of corruption to independent expenditures by PACs, whether large or small, simply does not pass this standard of review. Even assuming that Congress could fairly conclude that large-scale PACs have a sufficient tendency to corrupt, the overbreadth of § 9012(f) in these cases is so great that the section may not be upheld. We are not quibbling over fine-tuning of prophylactic limitations, but are concerned about wholesale restriction of clearly protected conduct. See *Broadrick* v. *Oklahoma*, 413 U. S. 601 (1973).

The judgment of the District Court is affirmed as to the constitutionality of § 9012(f), but is reversed on the issue of the Democrats' standing, with instructions to dismiss their complaint for lack of standing.

*It is so ordered.*

JUSTICE STEVENS, concurring in part and dissenting in part.

As I read it, the plain language of 26 U. S. C. § 9011(b)(1) confers standing on the Democratic National Committee. The fact that the Federal Election Commission also has standing is not, in my opinion, a sufficient reason for concluding that it was not appropriate for DNC to commence this action regardless of whether or not the FEC elected to participate. This, however, is just my tentative opinion because it really is not necessary to decide the issue discussed in Part I of the Court's opinion in view of the fact that the disposition of the appeal in No. 83–1122 is controlled by our decision in No. 83–1032. *McCulloch* v. *Sociedad Nacional de Marineros de Honduras*, 372 U. S. 10, 16 (1963).

Accordingly, I join only Part II of the Court's opinion.

JUSTICE WHITE, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join as to Part I, dissenting.

## I

Section 9011(b)(1) of the Internal Revenue Code authorizes the Federal Election Commission (FEC), "the national committee of any political party, and individuals eligible to vote for President" to institute actions "to implement or construe" the Fund Act. Relying on this provision, both the FEC and the Democratic National Committee (DNC) brought suit to enjoin expenditures by appellees that violated § 9012(f). Despite the identity of the issues raised and the relief sought by the plaintiffs, the majority holds that only the FEC properly invoked the jurisdiction of the District Court because only its action is "appropriate." I disagree.

## A

By its plain terms, § 9011(b)(1) confers standing on the DNC.[1] The DNC's suit is an "actio[n] for declaratory judgment or injunctive relief," brought by "the national committee of [a] political party," in order "to implement or construe" a provision of the Fund Act. See § 9011(b)(1). Therefore, the only possible reason for not allowing the suit is that, as the majority holds, it is inconsistent with the statute's limitation to "such actions . . . as may be appropriate."

The majority exalts the requirement of appropriateness by ignoring the term's context. Section 9011(b)(1) does not impose a free-floating requirement that any action brought thereunder meet some undefined standard of sound policy. Rather it merely refers to "such actions . . . as may be appropriate to implement or con[s]true" the Fund Act. The term "appropriate" limits the type of suit permissible to those aimed at implementing or construing the Act. Thus, the

---

[1] I agree with the majority that, under the plain terms of § 9011(b)(1), the Democratic Party has no cause of action.

named plaintiffs cannot bring just any action for declaratory judgment or injunctive relief, but only those that would be "appropriate to implement or con[s]true" the Act.[2] The DNC's present suit satisfies that standard. The focus is the nature of the lawsuit, not the identity of the plaintiff. To read more into the term than this is to treat it as an invitation to unconstrained judicial policymaking.

By placing a greater burden on the term "appropriate" than it can bear, the majority reaches a result that also conflicts with the rest of the provision. Section 9011(b)(1) itself draws no distinction between the FEC and other plaintiffs. To the contrary, by listing them together it implies that they enjoy an equal capacity to bring suit. Indeed, the majority seems to agree. Acknowledging that a suit by the DNC might be "appropriate," it finds its hands tied by the statute's failure to distinguish between possible plaintiffs: "Congress simply did not draft the statute in a way that distinguishes the DNC from any individual voter." *Ante*, at 488. This statement is perplexing, for the statute does not distinguish either from the FEC—though the majority does so anyway.

---

[2] Section 9011(b)(1) mirrors 2 U. S. C. § 437h(a), which allows the same plaintiffs to "institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of" the FECA. That section provides for certification of the constitutional question to the en banc court of appeals, and expedited review in this Court. I would read the word "appropriate" in both provisions identically, that is, as referring to the sort of controversy as to which the court's jurisdiction may be invoked.

I also note that individuals are unquestionably able to invoke the rather drastic provisions for expedited review provided by § 437h. See *Bread Political Action Committee* v. *FEC*, 455 U. S. 577 (1982); 120 Cong. Rec. 35140 (1974) (statement of Rep. Frenzel). In light of the clear intent behind § 437h, I have less difficulty than does the majority in believing that Congress similarly "intended every one of the millions of eligible voters in this country to have the power to invoke expedited review by a three-judge district court with direct appeal to this Court in actions brought" under § 9011(b)(1). See *ante*, at 487–488.

It is not clear why the majority feels free to ignore the statutory language in order to separate the FEC from other plaintiffs, but obliged to adhere to it so as not to distinguish party committees from individual voters.

Rather than applying the statute's plain words, the majority examines the overall election law scheme to discover what it thinks Congress would consider "appropriate." But Congress does not usually operate by such complex hidden meanings, and if Congress had intended what the majority says it did, it chose the least helpful way of saying so. It is surprising to learn that while the FEC, a national committee, and an individual may each sue under the Act, the latter two may sue only the first. Surely if this is what Congress had intended, it would have chosen a more convenient way of saying it.[3]

The majority relies primarily on 2 U. S. C. § 437c(b)(1), which grants the FEC "exclusive jurisdiction with respect to the civil enforcement of" the Act. When it adopted this provision, Congress did not change § 9011, which had already been in existence for five years. Indeed, except for the 1974 substitution of the Commission for the Comptroller General, § 9011 has never been amended, despite the frequent changes to the FECA and to other Fund Act provisions. By basing its argument on § 437c(b)(1), the majority contends in effect that § 9011 was repealed by implication. Absent a clear indication that such a repeal was intended, we should not infer

---

[3] The majority points to § 9010(a), which authorizes the FEC to "appear in and defend against any action filed under section 9011," as evidence that § 9011 suits "would be directed at the FEC." *Ante,* at 487. At most, this provision indicates that § 9011 suits *could* be directed against the Commission. In any event, the "defend against" language is fully explained by § 9011(a), which authorizes suits by "any interested person" to review "[a]ny certification, determination, or other action by the Commission." It is likely that § 9010(a) was designed merely to give the FEC authority to defend itself in these actions. Cf. 26 U. S. C. § 9040(a). It is also worth noting that if Congress really intended that private parties be able to sue only the FEC, it essentially accomplished that purpose in § 9011(a).

it. *Kaiser Steel Corp.* v. *Mullins,* 455 U. S. 72, 88 (1982); *Posadas* v. *National City Bank,* 296 U. S. 497, 503 (1936).

Here, all indications are to the contrary. When enacted, as part of the 1974 amendments to the FECA, § 437c(b)(1) provided the Commission with "primary jurisdiction with respect to the civil enforcement of" that Act. S. Conf. Rep. No. 93–1237, p. 22 (1974). There was no reference to the Fund Act at that time, or to the FEC's "exclusive" jurisdiction. Those were added in 1976. Pub. L. 94–283, § 101(c)(2), 90 Stat. 476. Two points must be made about the 1976 Amendments. First, the reference to "exclusive" jurisdiction was designed to centralize all *governmental* enforcement authority in the FEC. See H. R. Rep. No. 94–917, pp. 3–4 (1976).[4] The majority does not deny this, but states that there is no indication that anyone other than the Government agencies ever had any enforcement authority. *Ante,* at 489. The indication that the majority overlooks is § 9011(b)(1) itself.[5]

The second significant aspect of the 1976 Amendments is the addition of 2 U. S. C. § 437d(e). That section provides: "Except as provided in section 437g(a)(8) of this title, the power of the Commission to initiate civil actions under subsection (a)(6) of this section shall be the exclusive civil remedy for the enforcement of the provisions of this Act."

---

[4] Prior to 1976, the FECA included criminal proscriptions, found in Title 18 of the United States Code, whose enforcement was left to the Attorney General. In addition, civil enforcement authority was granted to both the FEC and the Attorney General. "The result was that enforcement responsibility was fragmented, and the line between improper conduct remediable in civil proceedings and conduct punishable as a crime blurred." H. R. Rep. No. 94–917, p. 3 (1976). The 1976 Amendments were designed to centralize enforcement authority in the Commission. *Id.,* at 3–4; S. Rep. No. 94–677, p. 7 (1976).

[5] The majority states that § 9011(b)(1) has nothing to do with "enforcement." *Ante,* at 489. If true, this assertion undermines the majority's reliance on § 437c(b)(1) in the first place. That section grants the FEC "exclusive jurisdiction with respect to . . . civil enforcement"; it says nothing about "exclusive jurisdiction" to bring suits to implement or construe.

"This Act" is specifically defined as the FECA. § 431(19). See also H. R. Rep. No. 94–917, p. 61 (1976). The reference to "this Act" in § 437d(e) is in marked contrast to the repeated references to "the provisions of this Act and chapter 95 and chapter 96 of title 26" (*i. e.*, the Fund Act), also added in 1976, found throughout these provisions. See, *e. g.*, §§ 437d(a)(6), (8); § 437f(c)(2); §§ 437g(a)(1), (2), (5), (6). The conspicuous absence of any reference to the Fund Act in § 437d(e) indicates that Congress intentionally made the FEC's litigating authority exclusive only as to the FECA. This section makes it quite clear that actions under § 437g(a)(8) are the only permissible suits a private party may bring to implement or construe the FECA, but, by negative implication, it also suggests that private suits are not so limited under the Fund Act.

## B

The majority places no reliance on the legislative history of § 9011. Admittedly, little is to be found. But what there is suggests that the DNC has standing to bring this action. Section 9011 was part of the Revenue Act of 1971. Pub. L. 92–178, § 801, 85 Stat. 570. It was in neither the House nor the Senate bill. In their joint explanatory statement, the conferees wrote that they had added "a provision to allow the Comptroller General or other interested parties to bring court actions in order to implement or construe the new provisions." S. Conf. Rep. No. 92–553, p. 58 (1971). This description provides no basis for distinguishing the Comptroller General (in the amended statute, the FEC) from the "other interested parties." Rather, it implies equal and independent authority to go to court.

The Conference Report goes on to note that "[b]ecause the provisions of this title will have a direct and immediate effect on the actions of individuals, organizations, and political parties . . . [who] must know" what candidates and parties will receive what funding, the bill provides for "expeditious disposition of legal proceedings brought with respect to these

provisions." *Id.*, at 58–59. This desire for speedy determinations explains why Congress provided the private right of action today's holding eliminates. It also undermines the majority's conclusion that it is "appropriate" to require those other than the FEC to file a complaint with the FEC and wait for it to act, or not act, sue to compel it to do so, and only then, if the FEC ignores a court order, bring suit themselves. That is a prescription for delay. The conferees' concern for the expeditious resolution of suits brought by "other interested parties" indicates that they did not want to restrict implementation of the Fund Act to a Government agency.

## C

"Appropriate" is not an ideal statutory term. But its vagueness should not be taken advantage of in order to read the provision in which it appears out of the United States Code. It is not an invitation to judicial legislation. A more restrained reading, consistent with congressional intent, the surrounding provisions, and, most important, the terms of the statute itself, is strongly indicated.

## II

Section 9012(f) of the Internal Revenue Code limits to $1,000 the annual independent expenditures a PAC can make to further the election of a candidate receiving public funds. Because these expenditures "produce speech at the core of the First Amendment," *ante,* at 493, the majority concludes that they can only be regulated in order to avoid real or apparent corruption. Perceiving no such danger, since the money does not go directly to political candidates or their committees, it strikes down § 9012(f).

My disagreements with this analysis, which continues this Court's dismemberment of congressional efforts to regulate campaign financing, are many. First, I continue to believe that *Buckley* v. *Valeo,* 424 U. S. 1 (1976), was wrongly decided. Congressional regulation of the amassing and spend-

ing of money in political campaigns without doubt involves First Amendment concerns, but restrictions such as the one at issue here are supported by governmental interests—including, but not limited to, the need to avoid real or apparent corruption—sufficiently compelling to withstand scrutiny.   Second, even were *Buckley* correct, I consider today's holding a mistaken application of that precedent.   The provision challenged here more closely resembles the contribution limitations that were upheld in *Buckley*, and later cases, than the limitations on uncoordinated individual expenditures that were struck down.   Finally, even if *Buckley* requires that in general PACs be allowed to make independent expenditures, I do not think that that proposition applies to § 9012(f).   As part of an integrated and complex system of public funding for Presidential campaigns, § 9012(f) is supported by governmental interests that were absent in *Buckley*, which was premised on a system of private campaign financing.

### A

In *Buckley*, I explained at some length why I am quite sure that regulations of campaign spending similar to that at issue here are constitutional.   See 424 U. S., at 257–266.   I adhere to those views.   The First Amendment protects the right to speak, not the right to spend, and limitations on the amount of money that can be spent are not the same as restrictions on speaking.   I agree with the majority that the expenditures in this case "produce" core First Amendment speech.   See *ante*, at 493.   But that is precisely the point: they produce such speech; they are not speech itself.   At least in these circumstances, I cannot accept the identification of speech with its antecedents.   Such a house-that-Jack-built approach could equally be used to find a First Amendment right to a job or to a minimum wage to "produce" the money to "produce" the speech.

The burden on actual speech imposed by limitations on the spending of money is minimal and indirect.   All rights of

direct political expression and advocacy are retained. Even under the campaign laws as originally enacted, everyone was free to spend as much as they chose to amplify their views on general political issues, just not specific candidates. The restrictions, to the extent they do affect speech, are viewpoint-neutral and indicate no hostility to the speech itself or its effects.[6]

If the elected Members of the Legislature, who are surely in the best position to know, conclude that large-scale expenditures are a significant threat to the integrity and fairness of the electoral process, we should not second-guess that judgment. *FEC* v. *National Right to Work Committee*, 459 U. S. 197, 210 (1982). Like the expenditure limitations struck down in *Buckley*, § 9012(f) serves to back up the limitations on direct campaign contributions, eliminate the danger of corruption, maintain public confidence in the integrity of federal elections, equalize the resources available to the candidates, and hold the overall amount of money devoted to political campaigning down to a reasonable level. I consider these purposes both legitimate and substantial, and more than sufficient to support the challenged provision's incidental and minor burden on actual speech.

In short, as I said in *Buckley*, 424 U. S., at 262, I cannot accept the cynic's "money talks" as a proposition of constitutional law. Today's holding also rests on a second aspect of the *Buckley* holding with which I disagree, viz., its distinction between "independent" and "coordinated" expenditures. The Court was willing to accept that expenditures undertaken in consultation with a candidate or his committee should be viewed as contributions. *Id.*, at 46. But it rejected Congress' judgment that independent expenditures were matters of equal concern, concluding that they did not

---

[6] The situation might be different if the regulation significantly favored incumbents; for example, if Congress had imposed unreasonably low spending limits that placed a particular burden on challengers. There is no indication that is the case.

pose the danger of real or apparent corruption that supported limits on contributions.[7] The distinction is not tenable. "Independent" PAC expenditures function as contributions. Indeed, a significant portion of them no doubt would be direct contributions to campaigns had the FECA not limited such contributions to $5,000. See 2 U. S. C. § 441a(a)(2)(A). The growth of independent PAC spending has been a direct and openly acknowledged response to the contribution limits in the FECA. See, e. g., Brief for Appellees 3–4. In general, then, the reasons underlying limits on contributions equally underly limits on such "independent" expenditures.

The credulous acceptance of the formal distinction between coordinated and independent expenditures blinks political reality. That the PACs' expenditures are not formally "coordinated" is too slender a reed on which to distinguish them from actual contributions to the campaign. The candidate cannot help but know of the extensive efforts "independently" undertaken on his behalf. In this realm of possible tacit understandings and implied agreements, I see no reason

---

[7] I note that the actual rationale of the *Buckley* Court was that "independent advocacy . . . *does not presently appear* to pose dangers of real or apparent corruption comparable to those identified with large campaign contributions." 424 U. S., at 46 (emphasis added). The possibility was thus left open, and remains open, that unforeseen developments in the financing of campaigns might make the need for restrictions on "independent" expenditures more compelling. See also *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 789–790 (1978). The exponential growth in PAC expenditures, accompanied by an equivalent growth in public and congressional concern, suggests that independent expenditures may well prove to be more serious threats than they appeared in 1976. See generally Hearings on S. 85 et al. before the Senate Committee on Rules and Administration, 98th Cong., 1st Sess. (1983) (hereinafter 1983 Hearings); Contribution Limitations and Independent Expenditures, Hearings before the Task Force on Elections of the House Committee on House Administration, 97th Cong., 2d Sess., 151–437 (1982). The time may come when the governmental interests in restricting such expenditures will be sufficiently compelling to satisfy not only Congress but a majority of this Court as well.

not to accept the congressional judgment that so-called independent expenditures must be closely regulated.[8]

The PACs do not operate in an anonymous vacuum. There are significant contacts between an organization like NCPAC and candidates for, and holders of, public office. In addition, personnel may move between the staffs of candidates or officeholders and those of PACs. See generally App. 30–40, Joint Stipulations of Fact Nos. 40–103. This is not to say that there has in the past been any improper coordination or political favors. We need not evaluate the accuracy of reports of such activities, or of the perception that large-scale independent PAC expenditures mean "the return of the big spenders whose money talks and whose gifts are not forgotten." See N. Y. Times, June 15, 1980, section 4, p. 20E, col. 1. It is enough to note that there is ample support for the congressional determination that the corrosive effects of large campaign contributions—not least among these a public perception of business as usual—are not eliminated solely because the "contribution" takes the form of an "independent expenditure." "Preserving the integrity of the electoral process [and] the individual citizen's confidence in government" "are interests of the highest importance." *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765, 788–789 (1978).

As in *Buckley,* I am convinced that it is pointless to limit the amount that can be contributed to a candidate or spent with his approval without also limiting the amounts that can be spent on his behalf.[9] In the Fund Act, Congress limited

---

[8] In opposing an early version of campaign spending legislation, Senator Gore objected to the bill because "expenditures would be outside the so-called restriction as long as the candidate had no 'control' over the organization, and lack of 'control' is very easy to manage." 113 Cong. Rec. 10201 (1967). See also 1983 Hearings, at 56 (statement of Sen. Bentsen).

[9] In a discussion with which I entirely agree, the Senate Committee supported the 1974 limits on "independent expenditures" as follows:

"[S]uch controls are imperative if Congress is to enact meaningful limits on direct contributions. Otherwise, wealthy individuals limited to a $3,000

contributions, direct or coordinated, to zero. It is nonsensical to allow the purposes of this limitation to be entirely defeated by allowing the sort of "independent" expenditures at issue here, and the First Amendment does not require us to do so.

## B

Even if I accepted *Buckley* as binding precedent, I nonetheless would uphold § 9012(f). *Buckley* distinguished "direct political expression," which could not be curtailed, from financial contributions, which could. 424 U. S., at 21–22. Limitations on expenditures were considered direct restraints on the right to speak one's mind on public issues and to engage in advocacy protected by the First Amendment. *Id.*, at 48. The majority views the challenged provision as being in that category. I disagree.

The majority never explicitly identifies whose First Amendment interests it believes it is protecting. However, its concern for rights of association and the effective political speech of those of modest means, *ante*, at 494–495, indicates that it is concerned with the interests of the PACs' contributors. But the "contributors" are exactly that—contributors, rather than speakers. Every reason the majority gives for treating § 9012(f) as a restraint on speech relates to the effectiveness with which the donors can make their voices heard. In other

---

direct contribution could also purchase one hundred thousand dollars' worth of advertisements for a favored candidate. Such a loophole would render direct contribution limits virtually meaningless.

"Admittedly, expenditures made directly by an individual to urge support of a candidate pose First Amendment issues more vividly than do financial contributions to a campaign fund. Nevertheless, to prohibit a $60,000 direct contribution to be used for a TV spot commercial but then to permit the would-be contributor to purchase the time himself, and place a commercial endorsing the candidate, would exalt constitutional form over substance. Your Committee does not believe the First Amendment requires such a wooden construction." S. Rep. No. 93–689, pp. 18–19 (1974).

words, what the majority purports to protect is the right of the contributors to make contributions.

But the contributors are not engaging in speech; at least, they are not engaging in speech to any greater extent than are those who contribute directly to political campaigns. *Buckley* explicitly distinguished between, on the one hand, using one's own money to express one's views, and, on the other, giving money to someone else in the expectation that that person will use the money to express views with which one is in agreement. This case falls within the latter category. As the *Buckley* Court stated with regard to contributions to campaigns, "the transformation of contributions into political debate involves speech by someone other than the contributor." 424 U. S., at 21. The majority does not explain the metamorphosis of donated dollars from money into speech by virtue of the identity of the donee.

It is true that regulating PACs may not advance the Government's interest in combating corruption as directly as limiting contributions to a candidate's campaign. See *Buckley*, 424 U. S., at 46. But this concern relates to the governmental interest supporting the regulation, not to the nature of the conduct regulated. Even if spending money is to be considered speech, I fail to see how giving money to an independent organization to use as it wishes is also speech. I had thought the holding in *Buckley* was exactly the opposite. Certainly later cases would so indicate. See *FEC* v. *National Right to Work Committee*, 459 U. S. 197 (1982); *California Medical Assn.* v. *FEC*, 453 U. S. 182 (1981).

The Court strikes down § 9012(f) because it prevents PAC donors from effectively speaking by proxy. But appellees are not simply mouthpieces for their individual contributors. The PAC operates independently of its contributors. See App. 26, Joint Stipulation No. 13. Donations go into the committee's general accounts. See App. 28–29, Joint Stipulations Nos. 27–30. It can safely be assumed that each contributor does not fully support every one of the variety of

activities undertaken and candidates supported by the PAC to which he contributes. It is true, as the majority points out, that in general the contributors presumably like what they hear. However, "this sympathy of interests alone does not convert" the PACs' speech into that of its contributors. *California Medical Assn.* v. *FEC, supra,* at 196.[10]

Finally, the burden imposed by § 9012(f) is slight. Exactly like the contributions limits upheld in *Buckley,* § 9012(f) "does not in any way infringe the contributor's freedom to discuss candidates and issues." 424 U. S., at 21. And because it does not limit personal expenditures, it does not "reduce the total amount of money potentially available to promote political expression." *Id.,* at 22. Accordingly, *Buckley* indicates that the decision below should be reversed.

## C

These cases are in any event different enough from *Buckley* that that decision is not dispositive. The challenged provision is not part of the FECA, whose expenditure limitations were struck down in *Buckley.* Rather, it is part of the Fund Act, which was, to the extent it was before the Court, upheld.

The Fund Act provides major party candidates the option of accepting public financing, drawn from a fund composed of voluntary checkoffs from federal income tax payments, and forgoing all private contributions. In upholding this system

---

[10] It is unclear whether the majority views § 9012(f) as an unconstitutional restriction on the First Amendment rights of appellees themselves. To the extent it does, I would have thought that such a conclusion was foreclosed by the Court's unanimous holding in *FEC* v. *National Right to Work Committee,* 459 U. S. 197 (1982). That decision cannot be explained away as merely a corporations case. *Ante,* at 495–496. The respondent in that case resembled appellees here far more closely than it resembled the traditional business corporation. In any event, the opinion referred broadly to "unions, corporations, and similar organizations," citing to a case involving a PAC, 459 U. S., at 210–211, and its reasoning applies equally here.

in *Buckley*, we accepted Congress' judgment that it would go far "to reduce the deleterious influence of large contributions on our political process, to facilitate communication by candidates with the electorate, and to free candidates from the rigors of fundraising." 424 U. S., at 91. Indeed, we were of the view that the Fund Act "furthers, not abridges, pertinent First Amendment values" by using "public money to facilitate and enlarge public discussion and participation in the electoral process." *Id.*, at 92–93.

It is quite clear from the statutory scheme and the legislative history that the public financing alternative was to be comprehensive and exclusive—a total substitution for private financing. If the public funding merely supplements rather than supplants the private, its benefits are nil. Indeed, early proposals for public financing came to grief on exactly this problem. For example, Congress passed a public funding scheme in 1966, Foreign Investors Tax Act of 1966, Pub. L. 89–809, 80 Stat. 1539, only to repeal it a year later. One of the reasons for abandoning that effort was, in the words of the sponsor of the repealing legislation, that it failed to limit the "raising and spending of private funds on behalf of presidential candidates or any other candidates" and would permit fundraising and spending to proceed as it had. 113 Cong. Rec. 8062–8063 (1967) (remarks of Sen. Gore). The same objection was voiced with regard to other proposals. See *id.*, at 30772–30773; Political Campaign Financing Proposals, Hearings before the Senate Committee on Finance, 90th Cong., 1st Sess., 169, 364, 389–390 (1967) (statements of Sens. Williams and Cannon). It is precisely this defect that § 9012(f) is designed to avoid.

Because it is an indispensable component of the public funding scheme, § 9012(f) is supported by governmental interests absent in *Buckley*. Rather than forcing Congress to abandon public financing because it is unworkable without constitutionally prohibited restrictions on independent spending, I would hold that § 9012(f) is permissible precisely

because it is a necessary, narrowly drawn[11] means to a constitutional end. The need to make public financing, with its attendant benefits, workable is a constitutionally sufficient additional justification for the burden on First Amendment rights.

The existence of the public financing scheme changes the picture in other ways as well. First, it heightens the danger of corruption discounted by the majority. If a candidate accepts public financing, private contributions are limited to zero. 26 U. S. C. §§ 9003(b)(2), 9012(b). Where there are no contributions being made directly to the candidate or his committee, and no expenditures of private funds subject to his direct control, "independent" expenditures are thrown into much starker relief. If those are the only private expenditures, their independence is little assurance that they will not be noticed, appreciated, and, perhaps, repaid.

The majority argues that there is no danger here of direct political favors—the paradigmatic ambassadorship in ex-

---

[11] Congress debated proposals to extend § 9012(f) to other organized groups or even individuals. See H. R. Rep. No. 92–708, p. 58 (1971); 117 Cong. Rec. 42397–42402, 42626–42627 (1971). It rejected such proposals in part out of concern for the constitutionality of any more sweeping restriction. See *id.*, at 42626. In light of Congress' careful balancing of First Amendment concerns against the integrity and effectiveness of public funding, I would be especially cautious before striking down its compromise.

Despite the restricted reach of § 9012(f), the majority announces that it is overbroad. I do not think these are appropriate cases for the "strong medicine" of overbreadth analysis, which "has been employed by the Court sparingly and only as a last resort," *Broadrick* v. *Oklahoma*, 413 U. S. 601, 613 (1973), and which assumes a chilling effect that, frankly, does not seem to be a problem here. In any event, the statute withstands scrutiny. It is carefully limited to those organizations, spending that amount of money, that Congress believed threatened the integrity of the electoral process. I fully share the majority's inability to "distinguish in principle between a PAC that has solicited 1,000 $25 contributions and one that has solicited 100,000 $25 contributions." *Ante*, at 499. But that is exactly why the statute is *not* overbroad. See *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 801–802 (1984).

change for a large contribution. Accepting, *arguendo*, this assertion, I still do not share the majority's equanimity about the infusion of massive PAC expenditures into the political process. The candidate may be forced to please the spenders rather than the voters, and the two groups are not identical. The majority concedes that aggregations of wealth influence the candidate for political office.[12] It is exactly this influence that Congress sought to escape in providing for public financing of Presidential elections, and that supports the limitations it imposed.

The provision for exclusive public funding not only enhances the danger of real or perceived corruption posed by independent expenditures, it also gives more weight to the interest in holding down the overall cost of political campaigns. In *Buckley*, this concern was partly ignored and partly rejected as not achieved by the means chosen. See 424 U. S., at 25–26, and n. 27, 48–49. Neither course is possible here. The Fund Act was a response not merely to "the influence of excessive private political contributions," but also to the "dangers of spiraling campaign expenditures." H. R. Rep. No. 93–1239, p. 13 (1974). I am unwilling to discount the latter concern, particularly in the context of a scheme where public financing is supposed to replace private financing and cap total expenditures. Certainly there can be no concern that communication will suffer for want of money spent on the campaigns.[13] Finally, in the context of the pub-

---

[12] One Senator has stated with regard to congressional campaigning:

"[T]he current system of financing congressional elections . . . virtually forces Members of Congress to go around hat in hand, begging for money from Washington-based special interest groups, political action committees whose sole purpose for existing is to seek a quid pro quo. . . . We see the degrading spectacle of elected representatives completing detailed questionnaires on their positions on special interest issues, knowing that the monetary reward of PAC support depends on the correct answers." 1983 Hearings, at 49 (statement of Sen. Eagleton).

[13] During the 1984 general election campaign, each major party candidate received $40.4 million in public funds, and each national committee was

lic financing scheme, the apparent congressional desire that elections should be between equally well financed candidates and not turn on the amount of money spent for one or the other is all the more compelling, and the danger of funding disparities more serious.

## D

By striking down one portion of an integrated and comprehensive statute, the Court has once again transformed a coherent regulatory scheme into a nonsensical, loophole-ridden patchwork. As THE CHIEF JUSTICE pointed out with regard to the similar outcome in *Buckley*, "[b]y dissecting the Act bit by bit, and casting off vital parts, the Court fails to recognize that the whole of this Act is greater than the sum of its parts." 424 U. S., at 235. Without § 9012(f), Presidential candidates enjoy extensive public financing while those who would otherwise have worked for or contributed to a campaign had there been no such funding will pursue the same ends through "independent" expenditures. The result is that the old system remains essentially intact, but that much more money is being spent. In overzealous protection of attenuated First Amendment values, the Court has once again managed to assure us the worst of both worlds. I respectfully dissent.

JUSTICE MARSHALL, dissenting.

In *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*, this Court upheld congressional limitations on contributions to candidates for federal office but struck down limitations on independent expenditures made on behalf of such candidates. In upholding the former, the Court stated that "the weighty interests served by restricting the size of financial contributions to political candidates are sufficient to justify the limited effect upon First Amendment freedoms caused by the $1,000 contribution ceiling." *Id.*, at 29. In striking down

---

permitted to spend another $6.9 million on its candidate's behalf. N. Y. Times, Aug. 29, 1984, p. A20, col. 1.

the latter, the Court noted that an expenditure limitation "fails to serve any substantial interest in stemming the reality or appearance of corruption in the electoral process," and that "it heavily burdens core First Amendment expression." *Id.*, at 47–48. Relying on *Buckley*, the Court today strikes down a limitation on expenditures by "political committees." Although I joined the portion of the *Buckley per curiam* that distinguished contributions from independent expenditures for First Amendment purposes, I now believe that the distinction has no constitutional significance.

The contribution/expenditure distinction in *Buckley* was grounded on two factors. First, the Court reasoned that independent expenditures offer significantly less potential for abuse than contributions:

> "Unlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and may indeed prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Id.*, at 47.

Undoubtedly, when an individual interested in obtaining the proverbial ambassadorship had the option of either contributing directly to a candidate's campaign or doing so indirectly through independent expenditures, he gave money directly. It does not take great imagination, however, to see that, when the possibility for direct financial assistance is severely limited, as it is in light of *Buckley*'s decision to uphold the contribution limitation, such an individual will find other ways to financially benefit the candidate's campaign. It simply belies reality to say that a campaign will not reward massive financial assistance provided in the only way that is legally available. And the possibility of such a reward provides a powerful incentive to channel an independent expend-

iture into an area that a candidate will appreciate. Surely an eager supporter will be able to discern a candidate's needs and desires; similarly, a willing candidate will notice the supporter's efforts. To the extent that individuals are able to make independent expenditures as part of a *quid pro quo*, they succeed in undermining completely the first rationale for the distinction made in *Buckley*.

The second factor supporting the distinction between contributions and expenditures was the relative magnitude of the First Amendment interest at stake. The Court found that the constitutional interest implicated in the limitation on expenditures was the right to advocate the election or defeat of a particular candidate. This right, the Court reasoned, "is no less entitled to protection under the First Amendment than the discussion of political policy generally or advocacy of the passage or defeat of legislation." *Id.*, at 48. In contrast, the Court found that the limitation on contributions primarily implicated "the contributor's freedom of political association." *Id.*, at 24–25. Although the Court acknowledged that this right was a "fundamental" one, *id.*, at 25, it concluded that the expenditure ceiling imposed significantly more severe restrictions on political freedoms than the contribution limitation, *id.*, at 23.

I disagree that the limitations on contributions and expenditures have significantly different impacts on First Amendment freedoms. First, the underlying rights at issue—freedom of speech and freedom of association—are both core First Amendment rights. Second, in both cases the regulation is of the same form: It concerns the amount of money that can be spent for political activity. Thus, I do not see how one interest can be deemed more compelling than the other.*

---

*At the time *Buckley* was decided, three of the eight Members who heard that case agreed that contributions and expenditures should be treated in the same manner for First Amendment purposes. See 424 U. S., at 241 (opinion of BURGER, C. J.) ("For me contributions and expenditures are two sides of the same First Amendment coin"); *id.*, at 261

In summary, I am now unpersuaded by the distinction established in *Buckley*. I have come to believe that the limitations on independent expenditures challenged in that case and here are justified by the congressional interests in promoting "the reality and appearance of equal access to the political arena," *id.*, at 287 (opinion of. MARSHALL, J.), and in eliminating political corruption and the appearance of such corruption. Therefore, I dissent, substantially for the reasons expressed in Parts II–A, II–C, and II–D of JUSTICE WHITE's dissent, from the Court's decision today to strike down § 9012(f)'s limitation on independent expenditures by "political committees."

Also, I join Part I of JUSTICE WHITE's dissent, which concerns the standing of the Democratic National Committee.

(opinion of WHITE, J.) ("For constitutional purposes it is difficult to see the difference between the two situations"); *id.*, at 290 (opinion of BLACK-MUN, J.) ("I am not persuaded that the Court makes, or indeed is able to make, a principled constitutional distinction between the contribution limitations, on the one hand, and the expenditure limitations, on the other, that are involved here").