**FEDERAL ELECTION COMMISSION,**
Plaintiff/Counter–Defendant/Appel-
lee/Cross–Appellant,

v.

**COLORADO REPUBLICAN FEDERAL
CAMPAIGN COMMITTEE,** Douglas
Jones, Defendants/Counter–Claim-
ants/Appellants/Cross–Appellees.

Nos. 93–1433, 93–1434.

United States Court of Appeals,
Tenth Circuit.

June 23, 1995.

Rehearing Denied Sept. 6, 1995.

Jan Witold Baran (Thomas W. Kirby, Carol A. Laham and Lee E. Goodman, also of Wiley, Rein & Fielding, Washington, DC, with him on the briefs) for the Colorado Republican Federal Campaign Committee and Douglas L. Jones.

Richard B. Bader, Associate Gen. Counsel (Lawrence M. Noble, Gen. Counsel, and Rita A. Reimer, Atty., also of Federal Election Com'n, Washington, DC, with him on the briefs) for the Federal Election Com'n.

Before HENRY and LOGAN, Circuit Judges, and REED, District Judge.*

LOGAN, Circuit Judge.

The Federal Election Commission (FEC) appeals from the dismissal on the merits of its underlying suit filed against the Colorado Republican Federal Campaign Committee and its treasurer, Douglas L. Jones (collectively the Committee) alleging violations of the Federal Election Campaign Act of 1971 (FECA), 2 U.S.C. §§ 431–442. The Committee cross-appeals from the dismissal as moot of its counterclaim challenging the constitutionality of the FECA expenditure limitations. We hold that the Committee expenditures at issue did violate the coordinated expenditure limitation in 2 U.S.C. § 441a(d)(3). We also reach the constitutional issue and hold that § 441a(d)(3) does not violate the Committee's First Amendment rights.

This action stems from the 1986 United States senatorial campaign in Colorado, and pre-election spending by the Committee. In January 1986, then-Congressman Timothy E. Wirth had registered with the FEC as a candidate for the Democratic nomination for

---

* The Honorable Edward C. Reed, Jr., Senior United States District Judge, United States District Court for the District of Nevada, sitting by designation.

the U.S. Senate. Several months later, but before either political party had nominated senatorial candidates, the Committee spent $15,000 for a radio advertisement directed at Wirth's announced candidacy ("Wirth Facts # 1").[1] This spending prompted the Colorado Democratic Party's administrative complaint with the FEC alleging that it was an "expenditure in connection with" the general election campaign of a candidate for federal office in violation of the spending limits set out in FECA § 441a(d)(3).

The FEC made a probable cause determination that the Committee violated the FECA. When the parties were unable to reach a settlement the FEC filed suit. The FEC alleged that the Committee failed to report the amount spent on the anti-Wirth publicity as an "expenditure in connection with" the general election campaign, in violation of FECA §§ 434(b)(4)(H)(iv), 434(b)(6)(B)(iv), and 441a(f). The Committee counterclaimed, alleging that the FECA was an unconstitutional infringement on its First Amendment rights. In ruling on the parties' cross motions for summary judgment, the district court dismissed the underlying action after finding no FECA violation, and dismissed the counterclaim as mooted by its merits ruling. These appeals followed.

### I

■ We first address whether the district court correctly concluded that the Committee did not violate the FECA. We review de novo a district court's grant of summary judgment using the same legal standards as the district court. *Clark v. Haas Group, Inc.*, 953 F.2d 1235, 1237 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 98, 121 L.Ed.2d 58 (1992).

### A

The FECA regulates contributions made to federal candidates and political parties,

and expenditures made by persons and political committees. It also imposes recordkeeping and reporting requirements. The Committee acknowledges that it is subject to the FECA as a federally registered committee of the Colorado Republican Party.

■ The statute limits monetary contributions and expenditures by state and national political party committees as follows:

**(d) Expenditures by national committee, State committee, or subordinate committee of State committee in connection with general election campaign of candidates for Federal office**

(1) Notwithstanding any other provision of law with respect to limitations on expenditures or limitations on contributions, the national committee of a political party and a State committee of a political party, including any subordinate committee of a State committee, may make expenditures in connection with the general election campaign of candidates for Federal office, subject to the limitations contained in paragraphs (2) and (3) of this subsection.

　　.　　　　.　　　　.　　　　.　　　　.

(3) The national committee of a political party, or a State committee of a political party, including any subordinate committee of a State committee, may not make any expenditure in connection with the general election campaign of a candidate for Federal office in a State who is affiliated with such party which exceeds—

(A) in the case of a candidate for election to the office of Senator, or of Representative from a State which is entitled to only one Representative, the greater of—

(i) 2 cents multiplied by the voting age population of the State (as certified under subsection (e) of this section); or

---

**1.** Wirth Facts # 1 read:
　Paid for by the Colorado Republican State Central Committee.
　Here in Colorado we're used to politicians who let you know where they stand, and I thought we could count on Tim Wirth to do the same. But the last few weeks have been a real eye-opener. I just saw some ads where Tim Wirth

said he's for a strong defense and a balanced budget. But according to his record, Tim Wirth voted against every major new weapon system in the last five years. And he voted against the balanced budget amendment.
Tim Wirth has a right to run for the Senate, but he doesn't have a right to change the facts.
I Jt.App. 95–96.

(ii) $20,000.

2 U.S.C. § 441a(d)(1) and (3). A state political party committee may assign to a designated agent (including a national party committee) the right to make the expenditures the state party could have made. *See FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 41–43, 102 S.Ct. 38, 46–48, 70 L.Ed.2d 23 (1981) (*DSCC*). Here the Committee expended funds on the anti-Wirth publicity after assigning to the National Republican Senatorial Committee the authority to make all of the expenditures—$103,248—it was allowed under § 441a(d)(3) for the 1986 U.S. Senate election. *See* I Jt.App. 4, 14; II *id.* 473. The Committee did not report the $15,000 anti-Wirth publicity expense under 2 U.S.C. § 434(b)(4)(H)(iv),[2] instead characterizing it as an·expense for "Voter Information to Colorado Voters—Advertising." II App. 478, ¶ A. The narrow issue is whether the anti-Wirth publicity expense was an "expenditure in connection with the general election campaign" pursuant to § 441a(d)(3) and should have been reported accordingly. If so, the Committee exceeded the § 441a(d)(3) monetary ceiling.

 As relevant here, the FECA addresses two types of campaign expenditures: independent and coordinated.[3] A coordinated expenditure is one made "in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate." *Buckley v. Valeo,* 424 U.S. 1, 47 n. 53, 96 S.Ct. 612, 648 n. 53, 46 L.Ed.2d 659 (1976). *See also* 11 C.F.R. § 110.7(b)(4). Because political parties are considered incapable of making independent expenditures, the district court correctly found that the anti-Wirth publicity expense was a coordinated expenditure. *See DSCC,* 454 U.S. at 29 n. 1, 102 S.Ct. at 41 n. 1. If that spending was an "expenditure[ ] in connection with" the campaign it was subject to the monetary limitations at § 441a(d). *Id.* The district court concluded that the Committee's coordinated expenditure on the anti-Wirth publicity was not made in connection with the 1986 Colorado senatorial campaign, and therefore was not subject to the § 441a(d)(3) limits.

### B

The FECA does not clearly manifest the meaning Congress intended to attach to the "expenditures in connection with" language in § 441a(d)(3). Acknowledging that there were no controlling or persuasive cases interpreting that section, the district court relied upon *FEC v. Massachusetts Citizens for Life,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (*MCFL*), and its interpretation of FECA § 441b. Section 441b[4] restricts the

---

**2.** 2 U.S.C. § 434(b)(4)(H)(iv) reads in part:

**(b) Contents of reports**
Each report under this section shall disclose—

. . . . .

(4) for the reporting period and the calendar year, the total amount of all disbursements, and all disbursements in the following categories:

. . . . .

(H) for any political committee other than an authorized committee—
(i) contributions made to other political committees;
(ii) loans made by the reporting committees;
(iii) independent expenditures;
(iv) expenditures made under section 441a(d) of this title; and
(v) any other disbursements.

**3.** An independent expenditure is "made without cooperation or consultation with any candidate, or any authorized committee or agent of such candidate, and which is not made in concert with, or at the request or suggestion of, any candidate, or any authorized committee or agent

of such candidate." 2 U.S.C. § 431(17); *see also* § 441a(a)(7)(A)–(B).

**4.** 2 U.S.C. § 441b provides in relevant part as follows:

(a) It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section, or any officer or any director of

contributions and expenditures of national banks, corporations, or labor organizations. The Supreme Court in *MCFL* considered whether Massachusetts Citizens for Life, Inc., a nonprofit, nonstock corporation, by financing a newsletter urging voter support for identified pro-life candidates, violated the "independent spending" limitations in § 441b. *Id.* at 241, 107 S.Ct. at 619. Interpreting the term "expenditure in connection with any election" the Court held that the expenditure "must constitute 'express advocacy' in order to be subject to the prohibition of § 441b." *Id.* at 249, 107 S.Ct. at 623.

*MCFL* relied upon the *Buckley* opinion's interpretation of a limitation on independent expenditures "relative to" a clearly identifiable candidate. To avoid invalidating on vagueness grounds what was then FECA § 608(e)(1), the *Buckley* Court held the term encompassed only "expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Buckley,* 424 U.S. at 44, 96 S.Ct. at 646–47. The opinion clarified in a footnote that this construction would restrict the application to "communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Id.* n. 52. *MCFL* adopted the same definition, referencing the same footnote, for purposes of § 441b's independent spending limitation. 479 U.S. at 249, 107 S.Ct. at 623.

The district court, noting the identity of the "expenditures in connection with" language in § 441b and in § 441a(d)(3), concluded that the anti-Wirth publicity was not express advocacy and therefore not governed by the § 441a(d)(3) limitations. The district court relied in part on a common law rule of statutory construction that identical words used in different sections of the same statute generally should be given the same meaning. However, the Supreme Court has also stated that "the presumption readily yields to the controlling force of the circumstance that words, though in the same act, are found in such dissimilar connections as to warrant the conclusion that they were employed in the different parts of the act with different intent." *Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 87, 55 S.Ct. 50, 51, 79 L.Ed. 211 (1934).

■ Further, we cannot overlook a significant distinction between *Buckley* and *MCFL* and the instant case. The *Buckley* opinion distinguished between independent expenditures—regulated by then FECA § 608(e)(1)—and coordinated expenditures. The *Buckley* opinion unequivocally stated that controlled or coordinated expenditures are treated as "contributions rather than expenditures" under the FECA.[5] 424 U.S. at 46–47 & n. 53, 96 S.Ct. at 648 & n. 53. Although *Buckley* found the ceiling on independent expenditures failed to serve substantial enough government interests to be constitutional, it reached the opposite conclusion as to the limitations on expenditures by national or state political parties. *Id.* at 55–59 & n. 67, 96 S.Ct. at 652–54 & n. 67 ("Does 18

any corporation or any national bank or any officer of any labor organization to consent to any contribution or expenditure by the corporation, national bank, or labor organization, as the case may be, prohibited by this section.
. . . .

(b)(2) For purposes of this section and section 79*l* (h) of Title 15, the term "contribution or expenditure" shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section, but shall not include (A) commu-

nications by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject; (B) nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at its members and their families; and (C) the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor organization, membership organization, cooperative, or corporation without capital stock.

5. Coordinated expenditures are treated as campaign contributions that must be reported pursuant to § 441a(a)(7)(B)(i).

U.S.C. § 608(f) (1970 ed., Supp. IV) violate [constitutional] rights, in that it limits the expenditures of national or state committees of political parties in connection with general election campaigns for federal office? Answer: NO, as to the Fifth Amendment challenge advanced by appellants."). *Buckley* accepted the FECA's treatment of expenditures by national and state committees of political parties as contributions, as have subsequent opinions of the Supreme Court. *See DSCC,* 454 U.S. 27, 29 n. 1, 102 S.Ct. 38, 41 n. 1 (1981) ("Party committees are considered incapable of making 'independent' expenditures in connection with the campaigns of their party's candidates. The Commission has, by regulation, forbidden such 'independent' expenditures by the national and state party committees."). Similarly, *MCFL* made the same distinction when interpreting the meaning of independent expenditure limits in § 441b. *MCFL,* 479 U.S. at 259–60, 107 S.Ct. at 628–29.

Subsequent amendments to the FECA include "expressly advocating" into the definition of independent expenditures. *See* 2 U.S.C. § 431(17). Coordinated expenditures of political parties, however, are not defined in this manner. *See id.* § 431(9)(B)(ix); *cf. id.* § 431(8)(B)(v), (x), (xii) (what is not a contribution). This is some evidence of congressional intent that the phrases are not intended to have the same meaning.

The distinction between independent expenditures and political party expenditures that are deemed to be contributions, and their different treatment by the Supreme Court, negates the necessity that "expenditures in connection with" be construed identically in different sections of the FECA. However, the meaning of "expenditures in connection with" is not perfectly clear, else the Court in *MCFL* would not have had to cabin its meaning under § 441b in the manner it did. The question then becomes whether we must construe the phrase as narrowly as the Supreme Court did in *MCFL* in order to uphold its validity.

## C

The FEC has issued advisory opinions interpreting the "expenditures in connection with" phrase in § 441a(d)(3) in a manner different than that adopted by the district court and urged upon us by the Committee. We believe this is an appropriate circumstance in which to follow the Supreme Court's admonishment that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnote omitted); *see also DSCC,* 454 U.S. at 37, 102 S.Ct. at 44–45 (the FEC, a bipartisan body, is "precisely the type of agency to which deference should presumptively be afforded").[6]

FEC Advisory Opinion 1984–15 addressed questions raised by the Republican Party regarding spending for a series of television ads denigrating the potential Democratic presidential candidates, relating to an upcoming election. The FEC responded to a specific question whether such spending was within the limitations of § 441a(d).

> These advertisements effectively advocate the defeat of a clearly identified candidate in connection with that election and thus have the purpose of influencing the outcome of the general election for President of the United States. *See generally* Advisory Opinion 1978–46. Therefore, expenditures for these advertisements benefit the eventual Republican presidential candidate and are made with respect to the presidential general election and in connection with the presidential general election campaign.

A.O. 1984–15, Fed. Elec. Campaign Fin. Guide (CCH) ¶ 5766 (May 31, 1984) (footnote omitted). The opinion then concluded that

---

**6.** We note that one of the reasons the *Buckley* opinion gave for its "express advocacy" restrictive interpretation of § 608(e)(1)'s "relative to" language was that most who were subject to the statute's criminal sanctions had no right to obtain an advisory opinion of the FEC. *See* 424 U.S. at 40 n. 47, 96 S.Ct. at 645 n. 47. It noted that only candidates, federal office holders and *political committees* had that right. *Id.* Section 441a(d), at issue before us, applies only to political committees; thus all to whom it applies can secure advisory opinions from the FEC.

the spending in question was a coordinated expenditure subject to the limitations in § 441a(d)(2).

■ Advisory Opinion 1985–14 responded to questions from a Democratic Congressional Campaign Committee regarding proposed publicity focusing on a number of congressmen, not all with announced opposition candidates. A.O. 1985–14, Fed. Elec. Campaign Fin. Guide (CCH) ¶ 5819 (May 30, 1985). The opinion endorsed Advisory Opinion 1984–15 with its construction of § 441a(d) as regulating expenditures that "both (1) depicted a clearly identified candidate and (2) conveyed an electioneering message." [7]

■ The FEC has "primary and substantial responsibility for administering and enforcing" the FECA. *Buckley,* 424 U.S. at 109, 96 S.Ct. at 677–78. The FEC argues that its construction of § 441a(d) as regulating political committee expenditures depicting a clearly identified candidate and conveying an electioneering message is a reasonable one to which we must defer. Viewing the party expenditures as contributions, as we must, we agree.

"[T]he primary interest served by the Act is the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office." *DSCC,* 454 U.S. at 41, 102 S.Ct. at 47. The Supreme Court cases have distinguished between the potential for corruption that attaches to contributions and coordinated expenditures, and those that might develop from independent expenditures, finding less inherent risk in the latter. Our analysis, therefore, with respect to controls on coordinated expenditures and contributions under

§ 441a is different than that required for § 441b.

Section § 441a(d) addresses the concern that large contributors to political parties will exert undue influence on a candidate if elected to office. The monetary ceiling on coordinated expenditures by political organizations diminishes the potential of such undue influence but preserves the important role of political parties. *See DSCC,* 454 U.S. at 41, 102 S.Ct. at 46–47. In contrast, the purpose behind § 441b is to prevent corporate and labor expenditures from effectively acting as "political war chests" on behalf of candidates, because these organizations could use funds "amassed in the economic marketplace ... [for] unfair advantage in the political marketplace." *MCFL,* 479 U.S. at 257, 107 S.Ct. at 627. The FECA thus provides different regulations tailored to different perceived evils.[8] Independent expenditures are theoretically unlimited but such expenditures in excess of low limits must be reported, along with identification of those who contributed more than $200. Contribution limits still apply. Giving deference to the FEC's interpretation, we hold that § 441a(d)(3) applies to coordinated spending that involves a clearly identified candidate and an electioneering message, without regard to whether that message constitutes express advocacy.

### D

■ The Committee does not seriously contest that the anti-Wirth publicity was directed at a clearly identified candidate. "Wirth Facts # 1" referenced Wirth's senatorial aspirations and challenged his personal integrity and campaign statements in the context of the current election.[9] Wirth was not yet the Democratic nominee, but the

---

7. Advisory Opinion 1978–46 appears more restrictive; it can be read to adopt the express advocacy position. A.O. 1978–46, Fed. Elec. Campaign Fin. Guide (CCH) ¶ 5348 (Sept. 5, 1978). But even if the more recent decisions . represent a change in position by the FEC we must still give the current view deference if the current construction is reasonable. *Rust v. Sullivan,* 500 U.S. 173, 186–87, 111 S.Ct. 1759, 1768–69, 114 L.Ed.2d 233 (1991).

8. We have already discussed how subsequent FECA amendments have adopted the "express

advocacy" criteria to differentiate between independent and coordinated expenditures.

9. *See also* 2 U.S.C. § 431(18) which reads:

The term "clearly identified" means that—
 (A) the name of the candidate involved appears;
 (B) a photograph or drawing of the candidate appears; or
 (C) the identity of the candidate is apparent by unambiguous reference.

FECA regulates coordinated expenditures made before the primary election. A.O. 1984–15, Fed. Elec. Campaign Fin. Guide (CCH) ¶ 5766. The Committee's objective to elect the eventual Republican candidate is not diminished because a Democratic nominee has not emerged. *See Buckley*, 424 U.S. at 79, 96 S.Ct. at 663 (major purpose of expenditures by candidates and political committees "is the nomination or election of a candidate").

 We next consider whether "Wirth Facts # 1" contained an electioneering message.[10] Advisory Opinion 1984–15 examined proposed television advertising by the Republican National Committee that would "question or challenge the candidate's statements, position, or record." The FEC concluded that the

> clear import and purpose of these proposed advertisements is to diminish support for any Democratic Party presidential nominee and to garner support for whoever may be the eventual Republican Party nominee. These advertisements relate primarily, if not solely, to the office of President of the United States and seek to influence a voter's choice between the Republican Party presidential candidate and any Democratic Party nominee in such a way as to favor the choice of the Republican candidate.... These advertisements effectively advocate the defeat of a clearly identified candidate in connection with that election and thus have the purpose of influencing the outcome of the general election for President of the United States. Therefore, expenditures for these advertisements benefit the eventual Republican presidential candidate and are made with respect to the presidential general election and in connection with the presidential general election campaign.

A.O. 1984–15, Fed. Elec. Campaign Fin. Guide (CCH) ¶ 5766 (citation and footnotes omitted). The next year, the FEC relied upon that construction in rendering Advisory Opinion 1985–14 to the Democratic Congressional Campaign Committee stating that "[e]lectioneering messages include statements 'designed to urge the public to elect a certain candidate or party.'" A.O. 1985–14, Fed. Elec. Campaign Fin. Guide (CCH) ¶ 5819 (quoting *United States v. United Auto Workers*, 352 U.S. 567, 587, 77 S.Ct. 529, 539, 1 L.Ed.2d 563 (1957)).

Any reasonable reading of "Wirth Facts # 1," which included the notation of Republican Party sponsorship, would leave the reader (or listener) with the impression that the Republican Party sought to "diminish" public support for Wirth and "garner support" for the unnamed Republican nominee. "Wirth Facts # 1" unquestionably contained an electioneering message. We conclude that the anti-Wirth publicity was an "expenditure in connection with" the 1986 Colorado senatorial election because it named both a clearly identifiable candidate and contained an electioneering message. The Committee, therefore, violated the FECA by making a § 441a(d)(3) expenditure after delegating to the National Republican Senatorial Committee the authority to spend all of the Committee's available funding for the 1986 Colorado Senate race.

## II

 We next consider the Committee's constitutional challenges to the FECA. The Committee asserts that the monetary caps in § 441a(d)(3) violate its First Amendment guarantees of freedom of speech and association. The Committee focuses on the alleged absence of a compelling governmental interest served by the restrictions in § 441a(d)(3) and also asserts that the statute discriminates based upon content. The FEC's position is that *Buckley* and later cases endorse distinctions between independent expenditures and contributions, and that other FECA contribution ceilings have consistently been upheld as constitutional by the Supreme Court. We agree with the FEC that § 441a(d)(3) is a permissible burden on speech and association.

---

10. We agree with the district court that the message in "Wirth Facts # 1" would not constitute express advocacy within the narrow definition of *Buckley* and *MCFL*. It lacks the express words "vote for" or "vote against," or words of similar import, although it comes close when the ad suggests that an identified candidate distorted his voting record.

**1024**

■ The primary purpose of the contribution and expenditure caps in the FECA are to prevent corruption or the appearance of corruption. *Buckley* 424 U.S. at 25–26, 96 S.Ct. at 637–38. The FECA starts from the premise that political committees may make only minimal expenditures in connection with campaigns, § 441a(a) (dollar limits on contributions), then creates one exception at § 441a(d)(3) (coordinated expenditure limits for certain political committees made in connection with federal election campaigns). *DSCC*, 454 U.S. at 28–29 n. 1, 102 S.Ct. at 40–41 n. 1; 11 C.F.R. § 110.7(b); *see also* 2 U.S.C. § 431(14)–(16). This exception allows for greater monetary support by political parties than would otherwise be permitted by § 441a(a). The coordinated expenditures permitted by § 441a(d)(3) are treated for purposes of reporting and monetary limitations as contributions from the political committee to the candidate, § 441a(a)(7)(B)(i); *see also* § 434(b)(4)(H)(iv), and fall within the contribution ceilings contained in § 441a(a). *See Buckley*, 424 U.S. at 46, 96 S.Ct. at 647–48; *FEC v. National Political Action Committee*, 470 U.S. 480, 492, 105 S.Ct. 1459, 1466, 84 L.Ed.2d 455 (1985) (*NCPAC*).

The same reasoning the Supreme Court used to uphold the constitutionality of other contribution limitations applies when analyzing the constitutionality of limits on coordinated expenditures by political committees.[11] The opportunity for abuse is greater when the contributions (or in the instant case, coordinated expenditures) derive from sources inherently aligned with the candidate, rather than with independent expenditures. *See Buckley*, 424 U.S. at 26–27, 96 S.Ct. at 638–39; *NCPAC*, 470 U.S. at 497, 105 S.Ct. at 1468–69. The Committee, stressing the benefits of party discipline and the broad interests of party success, argues that the dangers of domination of candidates by large individual donors do not apply to party expenditures. But party expenditures, particularly pre-primary, often are controlled by incumbent officeholders. We cannot say the dangers of domination that underlay the Supreme Court's acceptance of the constitutionality of contribution limits are not present in political party expenditures. The members of Congress who enacted this law were surviving veterans of the election campaign process, and all were members of organized political parties. They should be considered uniquely qualified to evaluate the risk of actual corruption or appearance of corruption from large coordinated expenditures by political parties. This case is, therefore, ideally postured for deference to the congressional will.

The Supreme Court has endorsed the government's interest in curtailing large campaign contributions as legitimate. In addition to preventing corruption or the appearance of corruption, these restrictions "equalize the relative ability of all citizens to affect the outcome of elections," *Buckley*, 424 U.S. at 26, 96 S.Ct. at 638, and to a degree cap campaign costs and increase accessibility to our political system. *Id.* The Court has distinguished between restrictions on contributions and restrictions on independent expenditures and then invalidated spending restrictions while upholding contribution limits. *Id.* at 58–59, 96 S.Ct. at 653–54.

By treating coordinated expenditures as contributions, the FECA effectively precludes political committees from literally or in appearance, "secur[ing] a political *quid pro quo* from current and potential office holders." *Id.* at 26–27, 96 S.Ct. at 638. Contribution limits regulate the quantity of political speech, but do not foreclose speech or political association. We do not see this monetary cap as content based; it is rather a consequence of the funding source. We uphold as constitutional, against the Committee's First Amendment challenge, the spending limits in § 441a(d)(3).

We REVERSE and REMAND with instructions that the district court enter judgment in favor of the FEC, and for a determi-

---

11. We acknowledge that *Buckley* upheld then 18 U.S.C. § 608(f) as constitutional when challenged as discriminatory under the Fifth Amendment, and not the First Amendment, which is the basis for the Committee's constitutional challenge here. *Buckley*, 424 U.S. at 59 n. 67, 96 S.Ct. at 654 n. 67. However, *MCFL* adopted much of the reasoning in *Buckley* in analyzing the First Amendment challenges to § 441b. We do not, therefore, discount the importance of *Buckley* in the context of our First Amendment analysis.

nation under 2 U.S.C. § 437g(a)(6) of the appropriate civil penalty.